**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cr-20200-SHL |
| | ) | |
| ALISSA GLASS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**

On October 28, 2020, deputies with the Tipton County Sheriff's Office ("Tipton County") went to the home of Defendant Alissa Glass ("Defendant" or "Glass") and, after entering the residence and accompanying Glass to her bedroom, discovered marijuana and methamphetamine.  Subsequently, on September 16, 2021, Glass was indicted under 21 U.S.C. § 841(a)(1) for knowingly and intentionally possessing with the intent to distribute 50 grams or more of methamphetamine.  (ECF No. 1.)

Before the Court are Glass' Motion to Suppress, (ECF No. 18), and the Government's Response.  (ECF No. 25.)  An evidentiary hearing was conducted on January 19, 2022 ("Suppression Hearing").  (ECF No. 37.)  Glass moves to suppress all evidence obtained from the search of her home, arguing that (1) the deputies lacked a warrant or consent to enter and to search her home and, as a result, (2) any evidence or statements resulting from the search should be suppressed as fruit of the poisonous tree.  In response, the Government argues that the Tipton County deputies properly obtained implied consent to enter Glass' house and express consent to search her bedroom, and that any evidence recovered from their search was legally obtained.

Neither Party asserts that the deputies possessed a valid warrant to enter Glass' residence and conduct a search.  Thus, the question here is whether the Government obtained valid consent to enter her residence and then proceed to search her bedroom.  For the following reasons, the Court finds that the deputies did not obtain valid consent to enter Glass' residence, and thus should not have then searched her bedroom.  The Court concludes that the statements and evidence collected from the search after the unlawful entry must be suppressed and therefore **GRANTS** Glass' Motion to Suppress.

## BACKGROUND[1]

On October 28, 2020, at around 11:35 p.m., Tipton County Deputy Tim Gross and Sergeant Jimmy Washam[2] were dispatched to a residence located at 110 Jane Drive, Munford, Tennessee, in response to an anonymous complaint alleging that narcotics were observed in the presence of children in that residence.  (ECF No. 18-1.)  110 Jane Drive is a "small, trailer-like home" with two bedrooms, a main living room, and a kitchen.  (ECF No. 25; see also Exhibit 1 (aerial view of 110 Jane Drive).)  According to Deputy Gross, the dispatch call did not provide any additional information about the complainant or whether an individual or children would be present at the residence.  (ECF No. 37.)

The deputies drove to the residence identified in the anonymous complaint and parked their patrol cars down the street from the house, next to the community mailboxes.  (ECF No. 37; ECF No. 25.)  The dash cameras ("dash cams") in their patrol cars were linked to body-worn

---

[1] The following facts are taken from Defendant's Motion, the Government's Response, and the testimony and exhibits offered at the Suppression Hearing.
[2] Jimmy Washam testified that he is currently self-employed, but he was a Tipton County Sergeant when these events took place.

microphones ("body mics") attached to each officer.[3]  (Exhibits 2, Gross Body Mic Recording ("Gross Recording") & 3, Washam Body Mic Recording ("Washam Recording").)

Deputy Gross testified that, when he stepped out of his patrol car, he detected the odor of marijuana.  (ECF Nos. 25, 37.)  However, he testified that he could not locate the smell's origin at the time.  (ECF No. 37.)  On the other hand, Sergeant Washam did not recall smelling marijuana as he was standing near a corner of the house, not far from the entrance.  (Id.)

While Deputy Gross approached the front door, Sergeant Washam performed a security check of the vehicles parked close to the residence.  Deputy Gross testified that he smelled strong odor of marijuana emanating from the residence before he knocked.  (Id.)  When he knocked on the front door, a female – later identified as Edie Budding, or "Nikki" – cracked open the door.  (ECF No. 25.)  According to Deputy Gross, the odor of marijuana intensified when she opened the door.  (ECF No. 37.)  He identified himself as from the Sheriff's Office, and Budding closed the door, reportedly saying that she would get the person who lived there. (ECF Nos. 18-1, 37.)

According to the Incident Report and Deputy Gross' testimony, Deputy Gross alerted Sergeant Washam that he could hear movement in the residence after Budding closed the door. (ECF Nos. 18-1, 37.)  In response, Sergeant Washam moved to the north corner of the building and observed, through a partially covered window, an adult wearing an orange shirt (the color of Budding's shirt that evening) enter a back room.  (ECF No. 37.)  Washam testified that it looked like the person "attempted to hide something."  (Id.)  He also asserted that he smelled marijuana

---

[3] Deputy Gross testified that the dash cam only records video of what occurs in front of the vehicle and that the body mic only picks up audio.  Deputy Gross and Sergeant Washam both testified that the body mic's audio was impacted by interference with their handheld radios and by increased distance from the patrol car; the audio on the recordings is thus often difficult to understand.  (ECF No. 37.)

Case 2:21-cr-20200-SHL   Document 39   Filed 01/31/22   Page 4 of 15   PageID 62

emitting through the window, and, once he returned to the front porch, smelled the odor coming from the residence.  (Id.)

Approximately one minute after Deputy Gross announced his arrival at the residence, and after another knock, Glass opened the front door.  (ECF No. 18-1.)  As she did so, "[t]he pungent odor of raw marijuana was immediately detected emitting from within the residence," according to the Incident Report.  (Id.)  Gross testified that, when Glass stepped back into the residence after opening the door, he took that as an invitation to enter the residence and stepped "maybe two feet in."  (ECF No. 37; see also ECF No. 25 (Government alleging that Glass "held the front door open allowing for the deputies to step into the entryway of the residence.").)  The body mic recordings contain no verbal exchange between the deputies and Glass indicating that the deputies asked to enter or that Glass gave them permission to do so.  And Deputy Gross and Sergeant Washam both testified that they did not ask, and were never verbally asked, to enter the residence by Glass or by Budding.  (Gross Recording; ECF No. 37.)  Sergeant Washam also acknowledged that, at that time, Glass did not have an obligation to let the officers in, but if she had prevented them from entering, then they would have detained the adults in the residence and obtained a search warrant.  (ECF No. 37.)

An exchange between Deputy Gross and Glass then began, and Sergeant Washam joined shortly thereafter.  (ECF No. 37.)  The deputies told her that they could smell marijuana from within the residence, which Glass denied.  (Gross Recording.)  Glass then asked who called Deputy Gross, whom she seemed to recognize,[4] and whether it was her "baby daddy."  (Id.)  Gross then asked how many adults were in the residence, and Glass identified that another

---

[4] Sergeant Washam testified that Deputy Gross mentioned that the residence was possibly the location of a person with whom he had previously interacted, and Deputy Gross testified that he had previously encountered Glass.  (ECF No. 37.)

woman, later identified as Budding, was inside.  (Id.)  Based on this information, Sergeant

Washam conducted a protective sweep of the house and found Budding in the back bedroom.

(Id.)  He testified that he did not observe marijuana or methamphetamine when in the bedroom,

and further noted that he was in that room for "mere seconds."  (ECF No. 37.)  Washam asked

Budding to go to the living room, and then narrowed the rest of his sweep only to "spaces where

a person could be hiding."  (ECF No. 25.)  Without finding any adults or observing any

contraband, he returned to the residence's entry.  (Id.)

Meanwhile, near the threshold of the residence, Deputy Gross told Glass that a complaint

was made about "stuff being used around kids," and asked to look around, a request to which

Glass did not immediately respond.  (Gross Recording.)  Glass repeatedly asked how the

deputies received the complaint, and stated that she was being harassed, presumably by the

person she believed to be the complainant.  (Id.)  The deputies focused on how they were

"knocked down with the smell of marijuana" when they knocked on the door, and Glass again

denied smoking marijuana.  (Id.)  Around this time, Glass began getting emotional.

After a back-and-forth conversation, Washam stated that "we want to be as cordial with

you as we can, our concern right now . . . is the children."  (Washam Recording.)  After that,

Deputy Gross stated to Glass that "[o]ne of two things are going to happen. Either you tell me

where its [sic] at, and I'll retrieve it. Or I'm going to call Narcotics [Unit], and they'll get a

search warrant, and they'll tear this whole place up."  (Gross Recording; ECF No. 25 at PageID

43.)  During the Suppression Hearing, Deputy Gross confirmed that if Glass had said "no," he

would have cleared the residence of all people, and contacted the Narcotics Unit to draw up a

search warrant.  (ECF No. 37.)

The recording contains sounds of Glass crying.  (Gross Recording.)  In the Suppression

Hearing, Deputy Gross conceded that it was "fair to say" that she was upset; Sergeant Washam related that she was "frantic and emotional." (ECF No. 37.) The deputies then assured Glass that they were "not trying to coerce [her]; [they] want [her] to understand." (Gross Recording.) They explained that they were "acting on officer discretion," but that "discretion goes out the door when other people get involved." (Id.) They also explained that they had probable cause to believe there was marijuana in the house and were looking for narcotics in general. (Id. ("We smell marijuana. And we're looking for narcotics . . . where's the weed and where's the rest.").) However, Deputy Gross testified that he did not present Glass with a consent-to-search form when he pressed her about the location of the marijuana. (ECF No. 37.) Deputy Gross also testified that the deputies talked about cooperation – that the more she cooperated, the better it would look, and the easier it would go. (ECF No. 37; Washam Recording.)

After the deputies' statements, Glass told the officers that they were smelling marijuana "roaches" that were in her residence. (Gross Recording.) After this admission, the deputies reiterated that they were "not harassing" her but simply "doing [their] job." (Id.) In an emotional response, Glass stated: "I know, but y'all walked in the house and I feel like y'all didn't know there were kids in here anyway." (Id.) Some of the recording is inaudible, but further discussion included the location of the marijuana. After the officers asked "where the weed at and where's the rest," Glass said that she was "gonna show it" to them. (Id.) They responded that she should just "point [them] to it and [they were] gonna retrieve it." (Id.)

Deputy Gross then accompanied Glass to the back bedroom where she pointed to the remains of several used marijuana roaches in a box. (ECF No. 37; ECF No. 18-1.) Gross testified that, while in the bedroom, he also saw a large bag of marijuana sitting on the nightstand beside her bed in plain view. (ECF No. 37.) At that moment, he referenced the narcotics on the

nightstand and told her that she was lying to him about marijuana roaches being the sole narcotics present in the residence.[5]  (Id; Gross Recording.)

After Deputy Gross indicated that he saw the marijuana on the nightstand, he testified that Glass became "belligerent" and "irate."  (ECF No. 37.)  When Deputy Gross attempted to detain her in handcuffs, she tried to dive on the bed.  (Id.)  He testified that he then saw a bag of a white substance, later identified as methamphetamine, lying on her bed in plain view during his struggle to restrain Glass.  (Id.; ECF No. 25 at PageID 44.)  Sergeant Washam, who heard the commotion, also entered the bedroom after Deputy Lorin Raines arrived to stay with Budding at the front of the residence.  (ECF No. 18-1.)  Gross and Washam then handcuffed Glass and brought her to a squad car.  (ECF No. 37.)

Deputy Gross testified that Glass was informed of her Miranda rights while in the squad car and that she seemed to understand her rights and consented to a search of the house.  (ECF No. 37.)  He also testified that Glass signed a consent-to-search form to allow such a search, but that her signed form has been "misplaced."  (ECF Nos. 37, 25.)

That subsequent search "revealed the bag of marijuana that was observed in plain view . . . the bag of white crystal substance observed in plain view . . . a mirror containing methamphetamine 0.6 grams arranged in multiple lines found under the bed," other unidentified tablets, and other items of drug paraphernalia.  (ECF No. 18-1.)  Although Deputy Gross testified that he believed photos were taken in the bedroom where the search took place pursuant to "protocol," he stated that the only photos located afterwards did not show where the marijuana was seen or how it was packaged.  (ECF No. 37.)  No photographs were offered at the Hearing.

---

[5] The Incident Report attests that the bag was sitting on a dresser; the Government's Motion contends that it was on storage bins; and the audio recording intimates that it was on the nightstand.  (ECF No. 18-1; ECF No. 25; Gross Recording.)

Finally, it was only after their search that the deputies checked on the children, who were still asleep in a front bedroom. (ECF No. 37.) Glass was thereafter taken into custody, charged, and transported to the jail. Her three children were released to her mother, and DCS was notified of the incident. (ECF No. 18-1.)

## ANALYSIS

Glass moves to suppress all evidence and statements obtained from the search of her home, arguing that (1) the deputies lacked a warrant or consent to enter or search her home and, as a result, (2) all evidence and statements obtained should be suppressed as fruit of the poisonous tree of the unlawful search. In response, the Government argues that the Tipton County deputies properly obtained consent to enter and search Glass' house. For the reasons stated below, the Court concludes that the deputies lacked consent to enter Glass' residence and thus the evidence that they recovered must be suppressed.

## I.   Consent to Initial Police Entry

Glass challenges the lawfulness of Deputy Gross and Sergeant Washam's entry into her residence, arguing that she gave no valid consent for them to enter. In response, the Government contends that Glass provided implied consent by taking steps back from the threshold, thus inviting the officers to step inside. Considering the totality of the circumstances, the Court finds that the Government failed to meet its burden to establish that Glass gave the deputies voluntary consent to enter.

The Fourth Amendment entitles individuals to a reasonable expectation of privacy in their homes and protects them from unreasonable searches and seizures. U.S. Const. amend. IV. While the Fourth Amendment generally requires a warrant to justify the search of a home, consent is a recognized exception to this requirement. United States v. Collins, No. 1:09-cr-

8

10007-JDB, 2010 WL 11519890, at *2–3 (W.D. Tenn. May 4, 2010), aff'd, 683 F.3d 697 (6th Cir. 2012).  When determining whether there was consent to search, "[t]he [G]overnment bears the burden of demonstrating by a preponderance of the evidence . . . that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." United States v. Canipe, 569 F.3d 597, 602 (6th Cir. 2009), reh'g denied, 558 U.S. 1036 (2009) (internal notations omitted).  The Government must make this demonstration through "clear and positive" testimony.  United States v. Hinojosa, 606 F.3d 875, 881 (6th Cir. 2010).

Whether consent was voluntary is determined by examining the totality of the circumstances.  United States v. McCauley, 548 F.3d 440, 446 (6th Cir. 2008).  A court must consider the age, intelligence and education of the person giving consent; whether she understands her constitutional rights; whether she understands her right to refuse consent; the length and nature of her detention; and the use of coercive or punishing conduct by police. United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999).  While a court may consider a defendant's knowledge of the right to refuse consent, "it is not a necessary finding."  McCauley, 548 F.3d at 446.  A consent determination is "'fact-specific,' and there is no 'magic' formula or equation for determining consent in the abstract."  Worley, 193 F.3d at 387.  Finally, "[c]onsent to a search may be nonverbal so long it is not the product of 'duress, coercion, or trickery.'" United States v. Ortiz, 455 F. App'x 669, 671 (6th Cir. 2012) (quoting United States v. Buchanan, 904 F.2d 349, 355 (6th Cir. 1990)).

At the Hearing, the Government argued that Glass provided the deputies with implied consent to enter by opening the door and stepping back in a fashion that made the officers feel that they had permission to step in.  (ECF No. 25; see also ECF No. 37.)  And that argument reflects the testimony offered – that Glass opened the door and stepped back, which Gross

interpreted as an invitation to enter.  In response, Glass contends that she did not provide

unequivocal, voluntary consent, specifically relying on Worley, 193 F.3d at 380.  According to

her, if her actions had to be interpreted to determine the basis for the entry by the deputies, then

those actions cannot be considered to be unequivocal consent as a matter of law.  (ECF No. 37.)

        In Worley, police officers approached Worley in the airport, asked to see his ID, boarding

pass, and ticket, questioned him about the veracity of his ticket purchase, and then inquired about

the contents of his bag.  193 F.3d at 382-83.  Worley complied and described its contents, and

the officers then asked to look inside the bag – to which Worley responded, "you've got the

badge, I guess you can."  Id. at 383.  The search revealed a plastic bag of methamphetamine.  Id.

At a suppression hearing, Worley argued that "he didn't feel like he could do much of anything

and he couldn't just walk away" when the officer asked to search the bag.  Id. (internal

quotations omitted).

        The Sixth Circuit affirmed the district court's order granting Worley's motion to

suppress.  Id. at 387.  Although the court found, inter alia, no evidence of coercion, that Worley's

actions were calm and cooperative, and that his age, intelligence, and education indicated an

ability to freely consent, it concluded that he did not give  an "unequivocal statement of free and

voluntary consent."  Id. at 386.  Instead, the Court understood his statement as "merely a

response conveying an expression of futility in resistance to authority or acquiescing in the

officers' request."  Id.  In support, the court relied on: (1) the officer's insistence to Worley that

he was wrong about his ticket being round-trip, which suggested that further disagreement was

futile; (2) Worley's subjective belief that he had no choice but to comply with the search; (3)

Worley's awareness of the officer's badge; and (4) his lack of assistance in their search and any

other statements indicating consent.  Id.

Although this Court reaches a similar conclusion as to suppression, Glass' analogy to Worley is not precisely on point for two reasons. First, the Government argues that Glass gave non-verbal, implied consent, unlike the circumstances in Worley. Moreover, this case turns on a different key fact: that, unlike the officers in Worley who asked to search his bag, Deputy Gross and Sergeant Washam never requested to enter Glass' residence.

A more analogous case is United States v. Little, 431 F. App'x 417, 420–21 (6th Cir. 2011). Although an unpublished[6] opinion, in Little, the Sixth Circuit concluded that there was no implied consent when officers failed to ask permission to enter a residence. In that case, while standing on the front porch of the defendant's mother's home, the officer asked Little to come to the police station for questioning about suspicion of producing child pornography. Id. at 418. Little asked if he could put on a shirt before going to the station, and the officer agreed. Id. Then, without asking for permission to enter, the officer followed Little into the house. Id.

The court identified several factors that would have supported a finding of implied consent, including that Little knew the officer, that he cooperated throughout the encounter, and that he did not object when the officer followed him inside. Id. at 419. However, the court relied on the officer's failure to ask the defendant for permission to enter the residence – and "logic dictates that a person cannot consent to a request that has not been made." Id. at 420. Because the officer neither obtained a search warrant nor requested and obtained consent to

---

[6] Similar to the district court in United States v. Blackaby, No. CR 17-5-DLB-EBA, 2018 WL 824495, at *5 (E.D. Ky. Feb. 12, 2018), this Court understands that an unpublished Sixth Circuit case does not constitute binding precedent. United States v. Sanford, 476 F.3d 391, 396 (6th Cir. 2007). However, like Blackaby, the Court finds the factual circumstances at play and the Sixth Circuit's analysis in Little "highly persuasive," and therefore will not "look past Little." 2018 WL 824495, at *5.

11

enter, the court concluded that the officer's actions violated the Fourth Amendment and that the evidence obtained as a result of the unconstitutional search should be suppressed.  Id.

Here, the circumstances are similar.  Glass recognized Deputy Gross from prior encounters, was cooperative, and did not object to the deputies' entry into her residence.  (ECF No. 37; Gross Recording.)  Moreover, there is no evidence suggesting that Glass lacked an ability to freely consent based on her age, intelligence, or education.  Yet, it is undisputed that neither Deputy Gross nor Sergeant Washam asked Glass for permission to enter her home before stepping inside the threshold when Glass stepped back.  That the defendant was cooperative and failed to expressly object to the officer's entry into his residence did not support a finding of voluntary, unequivocal consent in Little; neither does it do so here.  See also United States v. Blackaby, No. CR 17-5-DLB-EBA, 2018 WL 824495, at *5–6 (E.D. Ky. Feb. 12, 2018) (relying on the persuasive logic of Little in finding that consent was not voluntary when officers failed to ask permission to enter a defendant's home.)  The failure of the deputies to request permission to enter makes this situation different than other cases involving a non-verbal consent to search. See United States v. Ortiz, 455 F. App'x 669, 671 (6th Cir. 2012) (holding that the defendant gave valid consent after the officers asked him if they could enter his apartment); United States v. Carter, 378 F.3d 584, 587 (6th Cir. 2004) (en banc) (distinguished in Little due to the officer's request to enter); United States v. Williams, 754 F.2d 672, 675 (6th Cir. 1985) (holding that a response of "no problem" to an officer's request to search a suitcase constituted voluntary consent).

Protection from unreasonable searches and seizures is a constitutional bedrock, especially where individuals have the "utmost expectation of privacy" – in their homes.  United States v. Alvarado, No. 16-20748, 2017 WL 2438787, at *5 (E.D. Mich. June 6, 2017).  By entering

12

Glass' residence without a warrant or specific and unequivocal consent to enter, the deputies did not uphold this constitutional protection, and the Court must therefore find their entry to have been unlawful.

## II.    Consent to the Bedroom Search

Glass argues that the evidence found in the bedroom should be suppressed because of the unlawful entry into the house.  In response, the Government argues that Glass consented to escorting Deputy Gross to her bedroom where he saw the marijuana and methamphetamine in plain view.  (ECF No. 25 at PageID 48-49.)  The Court agrees with Glass – the unlawful entry into the house means that all evidence found thereafter must be suppressed.

When evidence is obtained in violation of the Fourth Amendment, it is generally inadmissible in federal court.  United States v. Pearce, 531 F.3d 374, 381 (6th Cir. 2008) (citing Mapp v. Ohio, 367 U.S. 643, 648 (1961)).  As the Supreme Court explained in Murray v. United States, 487 U.S. 533 (1988):

> The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search.  Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint.

Id. at 536–537 (internal quotes and citations omitted).  Thus, any evidence resulting from an unlawful search is "inadmissible under the 'fruit of the poisonous tree' doctrine."  United States v. Tatman, 615 F. Supp. 2d 664, 671–72 (S.D. Ohio 2008), aff'd, 397 F. App'x 152 (6th Cir. 2010).

Notwithstanding its breadth, this doctrine expressly provides that the "taint" from an unlawful search can be dissipated by certain circumstances, including an individual's consent, that create distance between the unconstitutional action and a later lawful action.  United States

v. Haynes, 301 F.3d 669, 682 (6th Cir. 2002) ("Under some circumstances, a voluntary consent to search is an event that may remove the taint of a prior search."). As a result, "[w]hen consent follows an illegal search, the Government must demonstrate that the 'consent was sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" Id. at 682 (quoting Brown v. Illinois, 422 U.S. 590 (1975) (emphasis in original). The liberty of a defendant to act freely and later provide consent to search can be "hindered" after an unlawful search because "[a] suspect's knowledge of a prior illegal search can give rise to a sense of futility." Haynes, 301 F.3d at 683. Thus, after experiencing an illegal entry, a person providing consent may believe that refusing it "would be a bit like closing the barn door after the horse is out." Id.; see also United States v. Allen, 771 F. Supp. 2d 752, 762 (W.D. Ky. 2011).

Here, the Government argues that the deputies obtained consent to search Glass' residence, when she allegedly (1) agreed to accompany the officers to her bedroom and indicate the location of the marijuana roaches, and (2) was Mirandized, and signed a consent-to-search form to permit the search of her bedroom. (ECF No. 25.) The Court disagrees. First, the Government does not establish through clear and positive testimony that Deputy Gross obtained Glass' consent to enter her bedroom as a voluntary gesture – and not as a result of a sense of "futility." See Haynes, 301 F.3d at 683. Indeed, the Government conceded that it would have been a "best practice" to have Glass sign a consent-to-search form before she led them to the back bedroom, and the deputies neither read Glass her Miranda rights at this time nor provided her with such a form. (ECF No. 37; Gross Recording.) Moreover, the approximately ten minutes that elapsed between the deputies' entry into her home and Deputy Gross' entry into her bedroom is insufficient to show a break in the causal chain between the illegal entry and the alleged "voluntary" consent. See United States v. Lopez-Arias, 344 F.3d 623, 629 (6th Cir.

14

2003).  The Court therefore concludes that Glass' alleged consent was not an "intervening act of free will."  Id.

As for the post-detention search, the Court similarly concludes that Glass' consent was not voluntary.  After witnessing the deputies' unlawful entry, as well as Deputy' Gross search of her bedroom that revealed the illegal substances, Glass could "reasonably believe[] that the horse was already out of the barn."  See Haynes, 301 F.3d at 683.  Further, the Court cannot assess the contents of the consent-to-search form that Glass supposedly signed while detained because it was "misplaced" and therefore is not part of this factual record.  (ECF No. 25.)  The Court thus finds that Glass did not consent to the post-detention search, even though she did receive Miranda warnings – which, alone, are "insufficient to purge the primary taint" of the unlawful encounter.  See United States v. Lopez-Arias, 344 F.3d 623, 630 (2003) (citing Kaupp v. Texas, 538 U.S. 626, 633 (2003)).

Having found that the officers lacked consent to enter Glass' home and to conduct any subsequent searches thereafter, the Court **GRANTS** Glass' Motion to Suppress.

## CONCLUSION

Consideration of the totality of the circumstances, including, in particular, the deputies' failure to request permission to enter Glass' residence before doing so, supports the conclusion that Glass did not give specific and unequivocal consent for the deputies to enter her residence, therefore rendering the evidence seized the fruit of the poisonous tree.  Thus, the Court **GRANTS** Glass' Motion to Suppress.

**IT IS SO ORDERED,** this 31st day of January, 2022.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE